Clerk's Office
Filed Date:  12/3/2020

3:47 PM

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

BROOKLYN OFFICE

AES/CC:DCP/DF:MEB/AS/DE
F. # 2020R00957

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | **I N F O R M A T I O N** |
| - against – | Cr. No. <u>20-539 (ENV)</u> |
| VITOL INC., | (T. 18, U.S.C., §§ 371 and 3551 <u>et</u> <u>seq</u>.) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.     <u>The Defendant and Relevant Entities and Individuals</u>

1.     The defendant VITOL INC. ("Vitol" or "the Company") was a United States company with its principal place of business in Houston, Texas.  Vitol was a "domestic concern," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1)(B).  Vitol was beneficially owned by a Dutch company named Vitol Holding BV.  These companies, together with their affiliates (the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

2.     Vitol S.A. was a Swiss company with its principal place of business in Geneva, Switzerland.  Vitol S.A. directly owned and controlled Vitol from approximately 2004 through 2009.  Together with Vitol, Vitol S.A. capitalized and oversaw certain operations of Vitol's Rio de Janeiro-based affiliate, Vitol do Brasil ("Vitol Brazil").

3.     "Vitol Trader 1," a dual citizen of the United States and another country, whose identity is known to the United States and to the Company, was a senior trader at Vitol who had oversight responsibilities for certain aspects of Vitol's operations in Latin America during the relevant period.   Vitol Trader 1 was a "domestic concern" and an employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

4.     "Vitol Trader 2," a citizen of the United States whose identity is known to the United States and to the Company, was a trader at Vitol during the relevant period.  Certain aspects of Vitol Trader 2's work were overseen by Vitol Trader 1.  Vitol Trader 2 was a "domestic concern" and an employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.     "Vitol Brazil Executive," a Brazilian citizen whose identity is known to the United States and to the Company, was a senior manager at Vitol Brazil during the relevant period.  Certain aspects of Vitol Brazil Executive's work were overseen by Vitol Trader 1 and Vitol Trader 2 during the relevant period.  Vitol Brazil Executive was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6.     Javier Aguilar ("Aguilar") was a Mexican citizen and resident of Houston, Texas.  Aguilar was an oil and commodities trader at Vitol during the relevant period.  Aguilar was a "domestic concern" and an employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3

7.      Petróleo Brasileiro S.A. – Petrobras ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that operated to refine, produce and distribute oil, oil products, gas, biofuels and energy.  The Brazilian government directly owned more than 50 percent of Petrobras's common shares with voting rights.  Petrobras was controlled by Brazil and performed government functions.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

8.      "Brazilian Official 1," a Brazilian citizen whose identity is known to the United States and to the Company, was a fuel oil trader for Petrobras who worked in Brazil during the relevant period.  Brazilian Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

9.      "Brazilian Official 2," a Brazilian citizen whose identity is known to the United States and to the Company, was a fuel oil trader for Petrobras who worked in Rio de Janeiro, Brazil and Houston, Texas during the relevant period.  Brazilian Official 2 used the code names "Batman" and "Robson Santos" in emails with Brazilian Official 2's co-conspirators. Brazilian Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

10.      "Brazilian Official 3," a Brazilian citizen whose identity is known to the United States and to the Company, was a trading manager for Petrobras in Rio de Janeiro, Brazil during the relevant period.  Brazilian Official 3 used the code name "Phil Collins" in emails with

4

Brazilian Official 3's co-conspirators.  Brazilian Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

11.     "Brazilian Official 4," a Brazilian citizen whose identity is known to the United States and to the Company, was a fuel oil trader for Petrobras in Rio de Janeiro, Brazil during the relevant period.  Brazilian Official 4 used the code names "Golfino" and "Dehl Phin" in emails with Brazilian Official 4's co-conspirators.  Brazilian Official 4 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

12.     "Brazilian Official 5," a Brazilian citizen whose identity is known to the United States and to the Company, was a trading manager for Petrobras in Rio de Janeiro, Brazil during the relevant period.  Brazilian Official 5 was sometimes referred to as "Beb" in emails between Brazilian Official 5's co-conspirators.  Brazilian Official 5 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

13.     "Brazilian Official 6," a Brazilian citizen whose identity is known to the United States and to the Company, was a trading manager for Petrobras in Rio de Janeiro, Brazil during the relevant period.  Brazilian Official 6 was sometimes referred to as "Popeye" in emails between Brazilian Official 6's co-conspirators.  Brazilian Official 6 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

14.    "Brazil Consultant 1," a Brazilian citizen whose identity is known to the United States and to the Company, was an intermediary who facilitated the payment of bribes on behalf of Vitol and others to Brazilian officials, including Brazilian Official 2, Brazilian Official 3, Brazilian Official 4, Brazilian Official 5 and Brazilian Official 6.  Brazil Consultant 1 used the code names "Tiger" and "Leregit" in emails with Brazil Consultant 1's co-conspirators.

15.    "Brazil Consultant 2," a Swedish citizen whose identity is known to the United States and to the Company, was an agent of Vitol during the relevant period and facilitated the payment of bribes on behalf of Vitol and others to Brazilian officials, including Brazilian Official 2, Brazilian Official 3, Brazilian Official 4, Brazilian Official 5 and Brazilian Official 6.

16.    Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned oil company of Ecuador.  Petroecuador was wholly owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own.  Petroecuador was an "instrumentality" of a foreign government, and Petroecuador's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

17.    "Ecuadorian Official 1," an Ecuadorian citizen whose identity is known to the United States and to the Company, was a senior manager at Petroecuador from approximately 2010 to May 2017.  Ecuadorian Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

18.     "Ecuadorian Official 2," an Ecuadorian citizen whose identity is known to the United States and to the Company, held various positions in the Ecuadorian Ministry of Hydrocarbons from approximately 2013 to 2016.  Ecuadorian Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

19.     "Ecuador Consultant 1," a citizen of Ecuador, the United States and Spain, whose identity is known to the United States and to the Company, was an intermediary who facilitated the payment of bribes to Ecuadorian officials.  Among other things, Ecuador Consultant 1 exercised control over companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials on behalf of Vitol and others.

20.     "Ecuador Consultant 2," a citizen of Ecuador and Spain, whose identity is known to the United States and to the Company, was an intermediary who facilitated the payment of bribes to Ecuadorian officials.  Among other things, Ecuador Consultant 2 incorporated companies and opened bank accounts in the United States and exercised control over companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian officials on behalf of Vitol and others.

21.     "Consulting Company," an entity the identity of which is known to the United States and to the Company, was a British Virgin Islands company formed by Ecuador Consultant 1 and Ecuador Consultant 2.

22.     "Intermediary 1," a citizen of Curacao whose identity is known to the United States and to the Company, was an intermediary who owned and maintained several shell

companies and bank accounts that were used to facilitate the payment of bribes to Ecuadorian and Mexican officials on behalf of Vitol.

23.      "State-Owned Entity," an entity the identity of which is known to the United States and to the Company, was a state-owned commodities trading company located in the Middle East.

24.      Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico.  PEMEX and its wholly-owned subsidiaries were owned and controlled by the government of Mexico and performed functions that Mexico treated as its own.  PEMEX and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and PEMEX's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A), 78dd-3(f)(2)(A).

## II.      The Foreign Corrupt Practices Act

25.      The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official to secure an improper advantage for the purpose of obtaining or retaining business for, or directing business to, any person.

## III.      The Brazil Bribery Scheme

26.      In or about and between 2005 and 2014, Vitol, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay more than $8 million in bribes to, and for the benefit of, Brazilian officials to secure an improper advantage in order to obtain and retain business from Petrobras in connection

with the purchase and sale of oil products.  Vitol and its affiliated companies earned at least $33 million in profits from its corruptly obtained contracts with Petrobras.

27.     In furtherance of the scheme, Vitol and its co-conspirators entered into sham consulting agreements, established a fictitious company to divert funds to offshore shell companies and created fake invoices for purported consulting services and "market intelligence." At times, Vitol and its co-conspirators used the U.S. financial system to transmit bribe payments, including through transactions in the Eastern District of New York, into offshore bank accounts, from which the bribes were paid in cash and/or via electronic wire payments to Brazilian officials.

 A.     <u>2005-2014: Bribes to Brazilian Official 1</u>

28.     In or about and between 2005 and 2014, Vitol and its co-conspirators caused corrupt payments of more than $3 million to be made to Brazilian Official 1 and at least three other officials at Petrobras in exchange for receiving confidential Petrobras information, including: (i) "market intelligence," which included internal Petrobras import and export forecasts and other confidential information intended to benefit Vitol in trading with Petrobras; and (ii) "last look" information, including confidential bid information that Petrobras received from Vitol's competitors, which Vitol used to determine the amount it would need to bid to win public tenders.

  i.     <u>Bribes for "Market Intelligence"</u>

29.     In or about August 2005, Vitol Trader 1 asked Vitol Brazil Executive to find a contact within Petrobras who could provide Vitol with confidential information regarding Petrobras's fuel oil import and export program.  The information Vitol Trader 1 requested

included information that was detailed in weekly internal Petrobras reports that contained Petrobras's production volume and quality, anticipated imports, shipping routes and cargo loading details.  On or about August 23, 2005, Vitol Trader 1 told Vitol Brazil Executive in an instant message exchange to get the information through "the back door" because Petrobras's "traders will never tell you anything . . . it has to be somebody in the planning/scheduling [d]ept."

      30.    In or about September 2005, during a lunch meeting with Vitol Brazil Executive, Brazilian Official 1 offered to provide Vitol Brazil Executive with confidential Petrobras information in exchange for bribe payments of $5,000 per month.

      31.    Following that meeting, on or about September 30, 2005, Vitol Brazil Executive sent Vitol Trader 1 a message through an instant messaging system stating, "just to inform you that the contact inside PB[,] it was made."  Vitol Brazil Executive then spoke separately with Vitol Trader 1 and Vitol Trader 2, and agreed to pay monthly bribes to Brazilian Official 1 in exchange for Vitol receiving confidential Petrobras information.

      32.    Pursuant to their agreement, Brazilian Official 1 provided Vitol Brazil Executive with confidential Petrobras information orally during regular in-person meetings, and by giving Vitol Brazil Executive electronic storage devices loaded with internal Petrobras documents and via email.  Vitol Brazil Executive shared the confidential information by email and telephone with Vitol Trader 1, Vitol Trader 2 and other Vitol Group employees in Houston and elsewhere.  Vitol Brazil Executive described the information he passed to other Vitol employees as "market intelligence."

33.      Over time, and with the agreement of Vitol Trader 1 and Vitol Trader 2, Vitol increased the amount of the bribe payments to Brazilian Official 1 for "market intelligence."  The bribe payments ranged from approximately $5,000 per month in 2005 to approximately $12,000 per month by in or about January 2014.

ii.      Bribes for "Last Look" Information

34.      In or about February 2006, Brazilian Official 1 offered Vitol Brazil Executive "last look" information on confidential competitive bids for fuel oil that Petrobras received from other companies, which would allow Vitol to match or beat the final bids submitted by Vitol's competitors.

35.      Shortly thereafter, Vitol Brazil Executive received approval from Vitol Trader 1 and Vitol Trader 2 to proceed with making bribe payments to get "last look" information.  Vitol paid Brazilian Official 1 bribes in the amount of eight cents per barrel of fuel oil that Vitol purchased from Petrobras in winning tenders.

36.      Vitol Brazil Executive shared the confidential "last look" information with Vitol Trader 1, Vitol Trader 2 and other Vitol Group employees based in Houston and elsewhere via telephone and email.  Using this information, Vitol employees determined the exact price that Vitol would need to bid to win a given Petrobras tender.  Vitol Trader 2 and other Vitol employees sometimes referred to this price as the "gold number" or the "golden number" in internal emails.

37.      For example, in an email exchange on or about May 10, 2013, between Vitol Brazil Executive and five Vitol Group employees in Houston and elsewhere, Vitol Brazil Executive reported that, "[Competitor] is offering plm +3,25.  This is the gold number."  In

response, a Vitol trader in Houston asked, "So if we go to +325 they will give it to us?"  Vitol Brazil Executive responded, "Yes. This is the gold number."  The trader responded, "Okay, great…we'll take it."

38.     After winning the trade, on or about May 29, 2013, Vitol took possession of the cargo in Houston, Texas.  On or about December 22, 2014, a fictitious company created by Vitol Brazil Executive (the "Brazil Sham Company," the identity of which is known to the United States and to the Company) invoiced Vitol S.A. for a per-barrel commission on the trade. The invoice directed Vitol S.A. to wire funds, through a correspondent bank account located in the United States, to a bank account in the Bahamas associated with a Brazilian "doleiro," that is, an individual who served as a professional money launderer and black market money exchanger, for purposes of paying a bribe to Brazilian Official 1 in cash.

39.     From at least in or about and between March 2006 and December 2014, Vitol paid for and received confidential "last look" information for over 50 Petrobras tenders.  In addition, on at least five occasions, Vitol also paid per barrel bribes to Brazilian Official 1 and three other Petrobras officials in connection with tenders outside of Brazil in which Petrobras was a Vitol competitor.  In connection with these tenders outside of Brazil, Vitol paid bribes to Petrobras officials in the amount of eight cents per barrel if Vitol won the tender or four cents per barrel if Vitol did not win.

            iii.        Transmission of Bribe Payments

40.     To facilitate and conceal Vitol's corrupt payments to Brazilian Official 1 and others, Vitol Brazil Executive, with the knowledge of Vitol Trader 1 and Vitol Trader 2,

used the Brazil Sham Company to invoice Vitol for amounts that would include bribes to be paid to Brazilian Official 1.

41.     Vitol caused dozens of invoices from Brazil Sham Company to be paid from an account in Switzerland held by Vitol S.A. to other accounts in Switzerland and the United States, ultimately for the payment of cash bribes to Brazilian officials.  In general, the funds were then transferred from the accounts in Switzerland and the United States to accounts in the Bahamas and Grand Cayman.  These accounts were held by doleiros, who converted the funds into Brazilian currency so that Vitol Brazil Executive could deliver cash to Brazilian Official 1.

42.     For example, a "market intelligence" invoice from Brazil Sham Company, dated on or about June 27, 2014, directed Vitol S.A. to pay $78,860 to an account in the Bahamas.  This account was held by a shell company associated with a Brazilian doleiro. Vitol's payment to the account passed through a correspondent bank account located in the United States.  The invoice sought monthly payments for "market intelligence" that Vitol expected to receive in or about and between July 2014 and December 2014.

43.     Likewise, a Brazil Sham Company invoice dated on or about June 26, 2013, was related to the receipt of "last look" information.  The invoice directed Vitol S.A. to pay an 8-cents-per-barrel commission totaling $56,227.06 to a bank account in the Bahamas. The account was held by a company associated with a Brazilian doleiro, and the bribe payment passed through a correspondent bank account located in the United States.

44.      After Vitol paid the Brazil Sham Company invoices and the doleiros converted the funds into Brazilian currency, Vitol Brazil Executive typically delivered cash bribe payments to Brazilian Official 1, who shared the per-barrel bribe payments with three other Brazilian officials.

B.      2011-2014: Bribes to Brazilian Officials 2 through 6

45.      While the bribery scheme involving Brazilian Official 1 was ongoing, Vitol also made corrupt bribe payments of more than $5 million to five additional officials at Petrobras, including Brazilian Official 2, Brazilian Official 3, Brazilian Official 4, Brazilian Official 5 and Brazilian Official 6.  Vitol paid the bribes to these Brazilian officials through intermediaries, Brazil Consultant 1 and Brazil Consultant 2, in exchange for receiving confidential pricing information that Vitol, at times, used to bid or offer on fuel oil contracts from Petrobras.

46.      Acting on behalf of Vitol, Brazil Consultant 2 engaged in secret negotiations with Brazilian Official 2, through Brazil Consultant 1, to establish corruptly-agreed upon prices for Petrobras contracts that included bribes to the Brazilian officials and commissions to Brazil Consultant 1 and Brazil Consultant 2.  After the prices were secretly agreed to pursuant to the corrupt scheme, the parties engaged in sham negotiations to make those negotiations appear legitimate.

i.      Bribes for Confidential Price Information

47.      In or about early 2011, Brazilian Official 3 sought assistance from Brazil Consultant 1 in finding an oil trading company that would pay bribes in exchange for receiving fuel oil contracts with Petrobras through Petrobras's trading operation in Houston.  Brazil

14

Consultant 1 suggested that Brazilian Official 3 could set up a scheme with Vitol, claiming that he had contacts within the company.  Brazilian Official 3 thereafter introduced Brazil Consultant 1 to Brazilian Official 2, a trader in Petrobras's fuel oil group in Houston, to further discuss the scheme.

48.      In or about April 2011, Brazil Consultant 2 met with a senior Vitol executive and, later, Vitol Trader 1 in Houston to discuss Brazil Consultant 2's potential engagement by Vitol to develop business with Petrobras.  In an email to Brazil Consultant 2 on or about April 26, 2011, Brazil Consultant 1 asked Brazil Consultant 2 to confirm what took place at the April 2011 meeting: "If I understood correctly "[the senior Vitol executive] said ok but please settle the details with [Vitol Trader 1].  Am I right?"  Brazil Consultant 2 responded, "Absolutely right!"

49.      In a telephone call in or about early 2011 with Brazilian Official 2, Brazilian Official 3 and Brazilian Official 4, Brazil Consultant 1 reported that Vitol had agreed to the details of the scheme and that the commissions paid from Vitol to Brazil Consultant 2 would be determined on a deal-by-deal basis.

50.      Also in or about early 2011, Brazil Consultant 1, Brazilian Official 2, Brazilian Official 3 and another Brazilian official held a meeting in Houston during which they agreed that payments to the group would be made to a bank account controlled by Brazilian Official 2 and then divided between Brazilian Official 2, Brazilian Official 3 and Brazilian Official 4.  Brazilian Official 5 and Brazilian Official 6 also agreed, at a later date, to receive their share of the bribes through Brazilian Official 2.

51.    In exchange for the bribe payments, Brazilian Official 2 provided confidential product and pricing information that allowed Vitol to determine its interest in pursuing a deal for that particular Petrobras cargo shipment.  After the information was provided, Brazil Consultant 2, acting on behalf of Vitol, negotiated a final price with Brazilian Official 2, through Brazil Consultant 1, between Vitol and Petrobras.  The "delta" between the sale price and the purchase price would be used to pay commissions and bribes.  They then facilitated a staged negotiation between Petrobras and Vitol for that particular cargo.  For example, on or about March 4, 2011, Brazil Consultant 1 (using the alias "Tiger") sent an email to Brazilian Official 3 (using the alias "Dehl Phin") and Brazilian Official 4 to advise them of the price Petrobras should offer to Vitol for a particular cargo, the price with which Vitol Trader 1 should counter, and the price on which they should agree at the end of the staged negotiation: "Gentlemen, your email should be to [Vitol Trader 1] indicating +17, Geneva will counter at +15 and close @ +16."

52.    Vitol consummated more than 30 transactions with Petrobras in this or a similar manner in or about and between 2011 and 2014.

ii.    Payments Through Brazil Consultant 1 and Brazil Consultant 2

53.    To facilitate and conceal the corrupt bribe payments to Brazilian Official 2, Brazilian Official 3, Brazilian Official 4, Brazilian Official 5 and Brazilian Official 6, Vitol entered into sham consulting agreements with companies controlled by Brazil Consultant 2. Once the trades between Vitol and Petrobras were finalized and the cargoes delivered, Brazil Consultant 2 sent Vitol an invoice for the commissions from Brazil Consultant 2's consulting companies.

54.     In general, upon receiving a payment from Vitol, Brazil Consultant 1 and Brazil Consultant 2 kept a portion of that payment and used the balance to pay bribes to Brazilian Official 2, Brazilian Official 3, Brazilian Official 4, Brazilian Official 5 and Brazilian Official 6 by wire transfer into bank accounts controlled by the Brazilian officials in Uruguay, Brazil and elsewhere.  Some of the bribes were also paid in cash.

55.     For example, in an email on or about May 5, 2011, Brazil Consultant 1 provided a spreadsheet to Brazilian Official 2, Brazilian Official 3 and Brazilian Official 4 showing the amounts invoiced to Vitol and another trading company, each member of the scheme's "share" of the commissions paid by Vitol and "what has already been paid."  Brazil Consultant 1 also described bribes paid but awaiting distribution: "[Brazilian Official 4] – you still have with me the amounts $ 66.264 + $ 86.763, for which I ask your instructions . . ."

IV.     The Ecuador and Mexico Bribery Scheme

56.     In or about and between 2015 and 2020, Vitol, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay more than $2 million in bribes to, and for the benefit of, officials in Ecuador and Mexico to secure an improper advantage in order to obtain and retain business in connection with the purchase and sale of oil products.

57.     In furtherance of the scheme, Vitol and its co-conspirators entered into several sham consulting agreements, set up shell companies for the purpose of laundering the corrupt payments, created fake invoices for purported consulting services and used email accounts with pseudonyms to transfer funds to offshore shell companies involved in the conspiracy.  The illegal payments were made through multiple bank accounts in the United

States, including in the Eastern District of New York, and abroad in an effort to conceal the bribes.

        A.     <u>Bribes to Ecuadorian Official 1 and Ecuadorian Official 2</u>

        58.     For example, beginning in or about 2015, Vitol, through its employees and agents, including Aguilar and Ecuador Consultant 1, agreed to pay bribes to Ecuadorian Official 1 and Ecuadorian Official 2 in exchange for identifying business opportunities for Vitol and others with Petroecuador and, in some cases, using their influence to ensure Vitol received the benefit of those opportunities.

        59.     Toward that end, in or about 2016, Vitol, through its employees and agents, including Aguilar and Ecuador Consultant 1, and Ecuadorian Official 1 began working on a prospective project related to the purchase of fuel oil from Petroecuador.  In particular, Vitol and Ecuadorian Official 1 discussed having Petroecuador contract with State-Owned Entity for the project, with Vitol contracting with State-Owned Entity on back-to-back terms, thereby bypassing a competitive tendering process.

        60.     In connection with that project, in or about 2016, Vitol, through its employees and agents, including Aguilar and Ecuador Consultant 1, agreed that Ecuadorian Official 1 would cause Petroecuador to award a contract for the purchase of fuel oil to State-Owned Entity (the "Fuel Oil Contract") for the ultimate benefit of Vitol and its related entities. Vitol, through its employees and agents, including Aguilar, Ecuador Consultant 1 and Ecuador Consultant 2, further agreed that Consulting Company, an entity the identity of which is known to the United States and to the Company and which was owned by Ecuador Consultant 1 and

18

Ecuador Consultant 2, would pay bribes to Ecuadorian officials in exchange for Ecuadorian Official 1's efforts to facilitate the award of the Fuel Oil Contract to State-Owned Entity for the benefit of Vitol.

61.     Specifically, Aguilar, Ecuador Consultant 1 and Ecuador Consultant 2 agreed that Vitol would pay Ecuador Consultant 1 and Ecuador Consultant 2 a per-barrel commission for fuel oil provided to Vitol in connection with the Fuel Oil Contract, and that Ecuador Consultant 1 and Ecuador Consultant 2 would use a portion of those funds to pay bribes to Ecuadorian officials on Vitol's behalf.  Aguilar advised Ecuador Consultant 1 and Ecuador Consultant 2 that the payments on behalf of Vitol would be made from Intermediary 1 to hide the payments.

62.     On or about December 6, 2016, Petroecuador and State-Owned Entity formally entered into the Fuel Oil Contract, under which Petroecuador agreed to supply State-Owned Entity with fuel oil over a period of 30 months in exchange for a $300 million prepayment made by the Vitol Group at a discount rate of 6.85 percent per year.

63.     On or about March 7, 2018, Ecuador Consultant 2 sent Intermediary 1 an email attaching 39 sham invoices from Consulting Company to a shell company controlled by Intermediary 1, which were dated in and about and between January 2017 and January 2018. Intermediary 1 forwarded that email to Aguilar on or about March 7, 2018, telling Aguilar, in Spanish, that he had received the attached invoices for consulting services from "los Equatorenos" and asked Aguilar how he should proceed.

64.     On or about April 20, 2018, Vitol S.A. wired approximately $1,863,200 through correspondent accounts located in the United States, to bank accounts located in Curaçao in the names of shell companies controlled by Intermediary 1.

65.     On or about May 18, 2018, Intermediary 1 sent an email to an email account with a pseudonym used by Aguilar indicating that Intermediary 1 had received several invoices from "Ecuador" totaling approximately $1.4 million, of which $510,000 had been paid, and asking Aguilar whether to pay the invoices.  Aguilar responded on the same day, using his pseudonymous email address, and instructed Intermediary 1 to make payments of up to $150,000 every fifteen days.

66.     On or about and between May 28, 2018 and June 25, 2018, Intermediary 1 wired three payments totaling approximately €201,306 Euro and one payment totaling approximately $19,283 from a shell company controlled by Intermediary 1 to bank accounts for Consulting Company located in the Cayman Islands and Curaçao that were controlled by Ecuador Consultant 1 and Ecuador Consultant 2.

67.     On or about July 5, 2018, Ecuador Consultant 1 and Ecuador Consultant 2 sent instructions to a bank to wire approximately $225,000 from an account owned by Ecuador Consultant 1 and Ecuador Consultant 2 in the Cayman Islands, through a correspondent bank account located in New York, New York, to an account located in Portugal for the benefit of Ecuadorian Official 1.

B.      Bribes to Mexican Officials

68.     In addition, from at least in or about and between 2015 and 2020, Vitol, through its employees and agents, used Intermediary 1 to make bribe payments to Mexican officials to receive inside information and obtain business.

69.     For example, in or about 2018, Vitol paid bribes to a Mexican official at a wholly-owned PEMEX subsidiary in order to receive confidential, inside information to help obtain a contract with the PEMEX subsidiary.  To effectuate the bribe payments, Vitol caused two Mexican entities to execute sham consulting agreements with shell companies controlled by Intermediary 1.

70.     Pursuant to the sham consulting agreements, the Vitol trader subsequently caused the Mexican entities to create fake invoices that the Vitol trader sent to Intermediary 1. Using the fake invoices to justify the payments, Intermediary 1 wired bribe payments to bank accounts controlled by the Mexican entities for the ultimate benefit of the Mexican official.

## COUNT ONE
(Conspiracy to Violate the FCPA – Brazilian Bribery Scheme)

71.     The allegations contained in paragraphs one through 70 are realleged and incorporated as if fully set forth in this paragraph.

72.     In or about and between 2005 and 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant VITOL INC., together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)      being a domestic concern, to make use of the mails and means and

instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:  (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist domestic concerns in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)      while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to commit an act corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a

foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist certain persons in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-3.

73.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant VITOL INC., together with others, committed, and caused the commission of, among others, at least one of the following:

<u>OVERT ACTS</u>

(a)     In or about April 2011, Brazil Consultant 2 traveled to Houston, Texas to meet with executives at Vitol to discuss his potential engagement by Vitol to develop business with Petrobras.

(b)     On or about April 19, 2011, Vitol wired approximately $449,346, through a correspondent bank in the Eastern District of New York, to a bank account in Switzerland held in the name of a company controlled by Brazil Consultant 2.

(c)     On or about May 10, 2013, Vitol Brazil Executive sent an email to five Vitol Group employees in Houston and elsewhere, stating: "[Competitor] is offering plm +3,25.  This is the gold number."

(d)     On or about May 29, 2013, Vitol took possession in Houston of the cargo acquired using the "gold number" provided by Vitol Brazil Executive in the May 10, 2013 email referenced above.

(e)     On or about June 26, 2013, Brazil Sham Company invoiced Vitol S.A. in the amount of $56,227.06 for a per-barrel commission related to the receipt of "last look" information by Vitol.

(f)     On or about February 4, 2014, Vitol wired approximately $111,566 to a bank account in Switzerland held in the name of a company controlled by Brazil Consultant 2.

(g)     On or about June 27, 2014, Brazil Sham Company invoiced Vitol S.A. in the amount of $78,860 for purported "market intelligence" Vitol expected to receive between July 2014 and December 2014.

(h)     On or about December 22, 2014, Brazil Sham Company invoiced Vitol S.A. in the amount of $24,931.77 for a per-barrel commission on the trade done using the "gold number" provided by Vitol Brazil Executive in the May 10, 2013 email referenced above. The invoice directed Vitol S.A. to wire funds, through a correspondent bank account located in the United States, to a company's bank account in the Bahamas.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT TWO</u>
(Conspiracy to Violate the FCPA – Ecuador and Mexico Bribery Scheme)

74.     The allegations contained in paragraphs one through 70 are realleged and incorporated as if fully set forth in this paragraph.

75.     In or about and between March 2015 and July 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant VITOL INC., together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a)     being a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:  (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist domestic concerns in obtaining and retaining business for and

25

with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-2; and

(b)      while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to commit an act corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of:  (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist certain persons in obtaining and retaining business for and with, and directing business to, Vitol and others, contrary to Title 15, United States Code, Section 78dd-3.

76.      In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant VITOL INC., together with others, committed, and caused the commission of, among others, at least one of the following:

OVERT ACTS

(a)      On or about April 20, 2018, Vitol S.A. wired approximately $1,113,200 through a correspondent account located in the United States, to a bank account located in Curaçao in the name of a shell company controlled by Intermediary 1.

(b)      On or about April 20, 2018, Vitol S.A. wired approximately $750,000 through a correspondent account located in the United States, to a bank account located in Curaçao in the name of a second shell company controlled by Intermediary 1.

(c)      On or about May 18, 2018, Aguilar emailed Intermediary from Aguilar's pseudonymous email address and instructed Intermediary 1 to make payments of up to $150,000 every fifteen days on invoices from Ecuador.

(d)      On or about July 5, 2018, Ecuador Consultant 1 and Ecuador Consultant 2 instructed a bank to wire approximately $225,000 from an account owned by Ecuador Consultant 1 and Ecuador Consultant 2 in the Cayman Islands, through a correspondent

27

bank account located in New York, New York, to an account located in Portugal for the benefit of Ecuadorian Official 1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)


_____
SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York


_____
DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Dept. of Justice